**SO ORDERED.**

**SIGNED** this 19 day of November, 2010.

_____
**J. Rich Leonard**
**United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
WILMINGTON DIVISION

IN RE:

**MICHAEL LYNN KIRKBRIDE** and                    CASE NO. 08-00120-8-JRL
**DOLORES AVOLINE KIRKBRIDE,**                             Chapter 11

       **DEBTORS.**

## ORDER

This matter came before the court on the debtors' motion for contempt and sanctions against creditor Bank of America, N.A., successor in interest to Countrywide Home Loans, Inc. A hearing was held on October 20, 2010, in Wilmington, North Carolina.

## JURISDICTION

The court has jurisdiction over this matter pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

## BACKGROUND

Debtors owned, renovated and rented several properties in Carolina Beach and Kure Beach, North Carolina. After the decline in the real estate market, debtors filed a voluntary petition under chapter 11 on January 8, 2008. Thereafter, the debtors filed a plan of reorganization on September 8, 2008, and filed an amended plan on September 26, 2008.

Countrywide Home Loans held deeds of trust on two properties: (1) 426 Oceana Way, Kure Beach, North Carolina ("Oceana") and (2) 736 North Fort Fisher Boulevard, Kure Beach, North Carolina ("Fort Fisher").

The amended plan included a provision which applied to the Oceana and Fort Fisher properties, stating that a consent order would be entered by which the debtors agree to surrender the properties as full satisfaction of the claims against them and consent to foreclosures on each.

The debtors and Countrywide drafted and signed a consent order on October 27, 2008. The consent order allowed: (1) relief from the automatic stay; (2) Countrywide to foreclose on the properties; and (3) the lifting of the stay to serve as full payment and satisfaction of Countrywide's claims secured by the properties. The amended plan was confirmed on April 9, 2009.

The contacts of which the debtors complain began on October 30, 2008, after the entry of the consent order. Countrywide continued to mail statements to the debtors regarding each property. Some of the statements included a disclaimer that the statement was being furnished for informational purposes only and should not be construed as an attempt to collect. However, other statements said the accounts were "seriously delinquent" and that the total amounts due must be paid immediately.

In addition to statements, the debtors received monthly notices on each property of fees assessed in relation to the loans. The fees varied each month and included attorney's fees, property inspection fees, and appraisal fees. In late April 2009, the debtors received letters for both properties stating the loans were in default and that in order to bring them current, the

amounts specified needed to be paid. The debtors received another demand for the balance of the loan on the Fort Fisher property on September 14, 2009 from Nationwide Trustee Services, the creditor's substitute trustee, stating the debt's total pay-off including all fees. A similar demand from Nationwide Trustee Services was sent to the debtors for the Oceana property on May 18, 2010. The creditor also sent a letter demanding the debtors obtain vacancy insurance on the Fort Fisher property on December 2, 2009 because the creditor was "recently notified" that the property may be vacant. This letter came over a year after the consent order on October 27, 2008 which essentially left the property in the hands of the creditor to be foreclosed upon, although title remained with the debtors. Finally, in February 2010, the Fort Fisher property was foreclosed on by the creditor.

As of the date of this hearing, the creditor has yet to foreclose on the Oceana property. As a result, enforcement proceedings by the New Hanover County Tax Department for unpaid taxes have commenced against the debtors,[1] as well as attempts by the property's home owners' association to collect unpaid dues. The female debtor sent an urgent letter to the creditor on April 15, 2010 requesting these debts be paid, specifically the county's senior lien, along with a copy of the notice of foreclosure and the consent order. The creditor did not and has not responded to her.

What makes the creditor's attempts to collect the debts particularly harrowing are the phone calls received by the debtors and amount of time spent trying to explain their lack of

---

[1] New Hanover County assessed an additional lien against Oceana for a nuisance caused by failure to maintain the pool on the property. The lien is part of the total due to the county. The female debtor testified she and her husband have not maintained the property since the consent order, because they expected the creditor to foreclose thereafter.

further liability on the debts. The phone calls commenced almost immediately after the consent order. The female debtor testified she received, at times, up to eight calls per week between October 2008 and May 2010. When the debtors first received the calls, the female debtor tried to answer as many as possible and explain the consent order and that they were waiting for the creditor to foreclose on the properties. The calls often involved being put on hold and repeating the same information to more senior personnel. The female debtor estimates each call would last thirty to forty minutes, and subsequent callers would not have record of or acknowledge the information relayed in previous calls. Even with a conservative estimate of five calls per week, over the course of eighty weeks, the debtors received approximately 400 calls. The female debtor estimates she answered at least 100 calls, as she simply did not have the time or energy to answer all of them. Each call lasted approximately thirty to forty minutes for a total of approximately fifty hours spent on the phone convincing different agents of the creditor that the debtors were no longer liable on the two debts.

The female debtor attempted to send the consent order and other information to the creditor to halt the calls. She testified that on numerous occasions she asked for fax numbers, mailing addresses, and email addresses of people she could send proof that she and her husband were not liable. She was given no means of doing so. Finally, in December 2009, the female debtor was able to forward the consent order, explaining the situation to Bank of America.[2] On January 5, 2010, Bank of America acknowledged receipt of her information with a letter, stating it would respond within 20 business days. The debtors have not received a direct response to

---

[2] At some date after the consent order and confirmation of the amended plan, Countrywide assigned its interest to Bank of America. Bank of America took over sending notices and phone calls to the debtors.

this day and, even after the acknowledgment, the phone calls and notices continued. It was not until May 2010 that the calls ceased, when the female debtor discussed the calls and notices–among other issues related to her bankruptcy–with her attorney and a motion for sanctions was filed.

The creditor's contacts have not only had an impact on the debtors in terms of time and energy consumption, but also in their ability to obtain a fresh start through bankruptcy. The creditor has failed to remove the negative reports of these obligations on the debtors' credit report. A January 26, 2010 credit report shows the debtors have past due balances of over $1 million on each note. Throughout their chapter 11 case, the debtors have entered into several consent orders with various creditors, by which their liability on those debts were extinguished in exchange for title to the collateral or the ability to foreclose immediately. The female debtor testified those negative credit reports have since been resolved and that the negative reports on the Bank of America notes are the last remaining blemishes on their credit report, which has impeded their ability to continue their real estate ventures and rebuild their business.

## DISCUSSION

The debtors ask the court to find Bank of America in contempt for violating the consent order and the order confirming plan, and to impose sanctions for willful violations of the consent order and order confirming plan. Pursuant to 11 U.S.C. §105(a), the court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [] title [11]." The court may take "any action or [make] any determination necessary or appropriate to enforce or implement court orders or rules to prevent an abuse of process." Id. This includes the

issuance of sanctions for violation of a court order such as the October 27, 2008 consent order. In re Adams, 2010 WL 2721205, at *4 (Bankr. E.D.N.C. July 7, 2010).

The court can also issue sanctions in this case for a violation of the discharge injunction, which bars attempts to collect or enforce discharged debts. 11 U.S.C. §524(a). In chapter 11 cases in which the debtor is an individual, discharge is generally not granted upon confirmation of the plan. § 1141(d)(5)(A). However, the court may "deviate from that general rule 'after notice and a hearing' if the court finds 'cause.'" In re Sheridan, 391 B.R. 287, 290 (Bankr. E.D.N.C. 2008). The debtor must give: (1) notice and hearing and (2) actual notice that a discharge prior to completion of all plan payments is being requested. Id. The notice requirement was satisfied in this case by a conspicuous notice in the disclosure statement and by a statement of notice during the confirmation hearing that a consent order would be entered into that allowed the creditor to foreclose in exchange for full satisfaction of the creditor's claim. Therefore, pursuant to § 1141(d)(5)(A), the debtors' liability to the creditor was discharged on confirmation of the amended plan and the creditor was barred by §524(a) from attempting to collect or enforce the debts.

**Civil Contempt**

The Fourth Circuit established the standard for civil contempt in Ashcraft v. Conoco, Inc., 218 F.3d 288 (4th Cir. 2000). Civil contempt requires a demonstration, by clear and convincing evidence, of:

> (1) the existence of a valid decree of which the alleged contemnor had actual or constructive knowledge;
> (2) . . . that the decree was in the movant's "favor";
> (3) . . . that the alleged contemnor by its conduct violated the terms of the decree, and had knowledge (at least constructive knowledge) of such violations; and
> (4) that [the] movant suffered harm as a result.

Ashcraft, 218 F.3d at 301 (citing Colonial Williamsburg Found. v. The Kittinger Co., 792 F. Supp. 1397, 1405-06 (E.D. Va. 1992), *aff'd.* 38 F.3d 133, 136 (4th Cir. 1994).

It is not disputed that the consent order is a valid decree of which the creditor had actual knowledge. Although the consent order was entered into by Countrywide, as a successor-in-interest, Bank of America is also bound by the consent order and confirmed plan. What is particularly frustrating is that the creditor actively negotiated the terms of the consent order with the debtors, signed the order, and later, through the its agents, repeatedly acted as if the order did not exist and made it nearly impossible for the debtors to bring the order to the creditor's attention. The uncontradicted testimony of the female debtor is that she participated in at least 100 phone conversations with the creditor and brought the consent order to the attention of the representatives with whom she spoke. Accordingly, the creditor had actual and constructive knowledge of the order.

It is not disputed that the consent order was in the debtors' favor. The order provided that the creditor would foreclose on the Oceana and Fort Fisher properties and that such lifting of the automatic stay would constitute full payment and satisfaction of the loans to the debtors. Therefore, the order was in the debtors' favor as it satisfied their obligations and relieved them of any deficiency remaining after foreclosure.

The creditor also violated and had knowledge of its violations of the consent order. The lifting of the stay had an immediate effect[3] and constituted full payment and satisfaction of the loans, even though the creditor had yet to foreclose on either property. Therefore, subsequent

---

[3] The consent order waived the waiting period under Fed. R. Bankr. P. 4001(a)(3).

statements mailed to the debtors which demanded payment on the loans, assessed fees and costs, as well as the 400 phone calls demanding payment constituted attempts to collect debts that had already been satisfied by the consent order.  The creditor had knowledge of these violations in that the female debtor repeatedly brought the consent order to its attention by phone and facsimile.

Finally, the debtors have suffered harm as a result of the violations.  The debtors spent at least fifty hours on the phone attempting to resolve the situation on their own.  The creditor called the debtors over a period of two years during and outside regular business hours.  The debtors incurred attorneys fees for a matter that should have been quickly resolved after the female debtor's first few efforts to clarify that she and her husband were no longer liable on the debts.  Enduring a brief period of "one hand not knowing what the other is doing" might be acceptable, but certainly two years of it is not.  Lastly, the creditor's failure to correct the negative credit reports has harmed the debtors' ability to benefit from the fresh start supplied by their chapter 11 case.

This court in In re Adams acknowledged that increasingly, bankruptcy courts also assess whether a creditor's violation of the discharge injunction was willful.  Adams, 2010 WL 2721205, at *3.  Willfulness is "'proved by showing the creditors knew that the discharge injunction was invoked and intended the act which violated the injunction.'" Id. (citing In re Dendy, 396 B.R. 171, 178 (Bankr. D.S.C. 2008)).  This definition and requirement of willfulness in establishing contempt is derived from the Eleventh Circuit rule in In re Hardy, 97 F.3d 1384 (11th Cir. 1996).  As this court stated in Adams, "there is 'no clear rule' in the Fourth Circuit as to whether an alleged violation of the discharge injunction requires willfulness on the creditor's

8

part, but the Hardy rule has found increasing acceptance by other courts, including courts in this circuit." Adams, 2010 WL2721205, at *4 (citing Almond v. Ford Motor Co. (In re Almond), 2007 WL 1345224, at *5 (Bankr. M.D.N.C. 2007)). The Hardy rule only requires a preponderance of the evidence to show knowledge and intent in determining whether a creditor's actions were willful. Id.

There is more than a preponderance of evidence indicating Bank of America knew of the discharge injunction which came into operation by the incorporation of the consent order into the amended plan–the consent order that the creditor negotiated itself and signed well before confirmation of the plan on April 9, 2009. Furthermore, the creditor intended its attempts to collect the discharged debts approximately 400 times over with every phone call, fee assessment, and mailed statement that did not include the "for informational purposes only" disclaimer. Therefore, civil contempt on the part of Bank of America is clearly established. The court finds Bank of America willfully violated its October 27, 2008 order and discharge injunction.

**Damages**

As stated above, the court has authority under §105(a) to enforce orders and rules of the court to prevent abuse. Such authority includes issuing sanctions in the form of "actual damages, attorney's fees, and when appropriate, punitive damages." In re Cherry, 247 B.R. 176, 187 (Bankr. E.D. Va. 2000) (citing Mickens v. Waynesboro Dupont Employees Credit Union, Inc. (In re Mickens), 229 B.R. 114, 118 (Bankr. W.D. Va. 1999)).

In terms of compensatory damages, the debtors incurred $5,000.00 in attorney's fees in filing the instant motion on May 26, 2010 and preparing for the hearing. The court awards an additional $1,000.00 for the time expended at the hearing. Additionally, the court awards

debtors $50.00 per call for the approximately 300 unanswered calls, and $200.00 per call for the approximately 100 calls in which unsuccessful explanations were offered by the debtors. This totals $35,000 associated with the calls. There were at least 20 inappropriate written demands sent to debtors, for which the court awards an additional $2,000. The actions of the secured creditor here also embarrassed and humiliated the debtors by causing legal proceedings to be threatened and brought against them by their local government and homeowner's association. These damages are assessed at $10,000.00. Finally, the reporting of this extinguished debt to the credit reporting agencies as seriously in default impacted the debtors' credit rating and impeded the fresh start to which they are entitled. Damages for this are set at an additional $10,000.00. The total of compensatory damages is assessed at $63,000.00

The court also finds it necessary to award punitive damages. The standard by which courts in the Fourth Circuit have awarded punitive damages for violation of an order or discharge injunction requires a demonstration of "egregious conduct," "malevolent intent," or "clear disregard of the bankruptcy laws." Adams, 2010 WL 2721205, at *6 (citing Cherry, 247 B.R. at 189-90). It is appallingly clear to the court that Countrywide and Bank of America, as successor-in-interest, flagrantly disregarded the court's order and discharge injunction. The creditor harassed the debtors with phone calls and repeatedly dismissed the debtors' attempts to resolve the situation in the face of a clearly worded order barring further collection on these debts. It is beyond egregious that after almost two years of facing such harassment on their own, the debtors finally caught the attention of Bank of America only when they retained counsel and filed this motion. Furthermore, the creditor has erroneously left a significant scar on the debtors' credit report well after the consent order, which warrants punitive damages, as well. A

sophisticated creditor cannot be excused for flagrantly ignoring the terms of an order to which it consented, and even more seriously, having no internal procedures in place to correct the error when it is clearly called to its attention.  Punitive damages in an amount equal to the compensatory damages are assessed against Bank of America.

     The compensatory damages of $63,000.00 are to be paid directly to the debtors within 14 days of this date.  The punitive damages of $63,000.00 are to be paid to the Clerk of this Court within 14 days of this date.  The court will further enhance the sanctions if they are not paid as required.  Additionally, no later than 14 days from the date of this order, Bank of America shall provide proof to the debtors' counsel and to the court that Bank of America has corrected any errors on the debtors' credit report.

**END OF DOCUMENT**